## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

BOARD OF TRUSTEES OF THE HEAT &
FROST INSULATORS LOCAL NO. 33
PENSION FUND,
      Plaintiff,

    v.                                                                                  No. 3:11-cv-01998 (JAM)

D & N INSULATION CO., PETCO
INSULATION CO. INC., WOMCO
INSULATION INC., E.R.P. GROUP, INC.,
      Defendants.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

      A few years ago, three construction companies in West Haven, Connecticut closed their

business operations. Because these companies had employed union workers and were

signatories to a collective bargaining agreement, they were subject to "withdrawal liability" to

the union's pension fund for vested but unfunded pension benefits. The companies, however,

did not pay the money they owed. And the man who led these companies—Edward R.

Petrucci—started a new company—defendant E.R.P. Group, Inc. ("ERP")—that used non-

union employees to perform much of the same work that had been done by the now-shuttered

businesses.

      In this case, plaintiff—the board of trustees of the union pension fund—has sued the

three closed companies and ERP for payment of the companies' withdrawal liability. Plaintiff

contends that ERP is nothing more than an "alter ego" of the earlier companies, a company

created to avoid the earlier companies' withdrawal liability.

      Plaintiff has moved for summary judgment. I conclude that a reasonable fact finder

could reach only one conclusion: that the three closed companies are subject to withdrawal liability and that ERP is indeed the alter ego of the earlier companies and is therefore responsible for the withdrawal liability owed by the earlier companies. Accordingly, I will grant plaintiff's motion for summary judgment.

## BACKGROUND

The following facts are undisputed or, if subject to dispute, are set forth in the light most favorable to defendants against whom plaintiff seeks summary judgment.

*1. The Womco Entities' Closure and Withdrawal Liability*

For many years, defendants D & N Insulation Company, Petco Insulation Company, and Womco Insulation, Inc. (collectively, "the Womco entities") were businesses in the heat and frost insulation and asbestos removal industries.[1] All three entities operated out of the same building at 88 Farwell Street in West Haven, Connecticut, and they shared leadership. Edward R. Petrucci was the president of D & N Insulation Company and Petco Insulation Company, and his daughter Kristen L. Petrucci was the president, secretary, and director of Womco Insulation, Inc. Each of these three companies utilized union labor under a collective bargaining agreement between certain employers and the International Association of Heat and Frost Insulators and Allied Workers Local No. 33 (hereafter "the union"). Under the terms of the collective bargaining agreement, the companies were obligated as participating employers to make contributions to the union's pension fund. But in late 2008 or early 2009, the Womco entities ceased business operations, and they stopped making contributions to the fund on March 9, 2009.

As a result of their closure and stoppage of operations, the Womco entities were

---

[1] In 2004, D & N Insulation Company merged with Petco Insulation Company.

required to pay to the union's pension fund something called "withdrawal liability"—a sum of money that represents the entities' proportionate share of the pension plan's unfunded liabilities. This responsibility arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§1381–1453, which regulates multiemployer pension funds like the union's pension fund. Among other concerns, this law is designed "[t]o ensure the viability of multiemployer pension plans against the failure of a contributing employer." *UFCW Local One Pension Fund v. Enivel Properties, LLC*, 791 F.3d 369, 371 (2d Cir. 2015). As the Second Circuit has explained it:

> One aim [of ERISA] is to provide for a "sound termination insurance system" that ensures participants and beneficiaries [of retirement benefit plans] will receive their full benefits even if . . . their employer ceases operations. . . . When an employer "permanently ceases all covered operations under the plan," i.e., a "complete withdrawal," an obligation called "withdrawal liability" may be imposed on that employer.

*Ret. Plan of the UNITE HERE Nat. Ret. Fund v. Kombassan Holding*, 629 F.3d 282, 285 (2d Cir. 2010) (quoting 29 U.S.C. §§ 1001b, 1381(a), 1383(a)).

The union's pension fund fulfilled its statutory obligations to notify the Womco entities of their withdrawal liability and to demand payment. *See* 29 U.S.C. § 1399(b) (setting forth statutory notice obligations); Doc. #56-38 at 2–5 (affidavit of treasurer describing notification to Womco entities). None of the Womco entities contested the amounts owed or requested arbitration, as they were required to do if they disputed the assessed withdrawal liability. *See* 29 U.S.C. § 1401(a)(1). Accordingly, the Womco entities are collectively responsible for withdrawal liability in the sum of $4,253,732.[2] *See* 29 U.S.C. § 1401(a), (b)(1) (providing that

---

[2] The union's pension fund assessed the withdrawal liability of D & N Insulation Company and Petco Insulation Company at $2,376,565, and the withdrawal liability of Womco Insulation, Inc., at $1,877,167. *See* Doc. #56-38, ¶¶ 9, 15. The Womco entities collectively owe this withdrawal liability because they were "under

employer owes withdrawal liability demanded by the pension plan sponsor when an employer does not request arbitration). There is no dispute that this withdrawal liability has never been paid.

2.   *The Emergence of ERP*

Around the same time that the Womco entities were closing their operations, Edward Petrucci started a new company. On February 20, 2009, he formed defendant ERP, adopting his own initials for the company's name and becoming its first president. According to an affidavit submitted by Kevin Cwikla, business manager of the union, Petrucci contacted the union around this time. Petrucci allegedly informed Cwikla that he had formed ERP, and he asked that ERP take over the Womco entities' subcontracts and use union labor. Cwikla contends that, "during a subsequent phone call, [Cwikla] asked Edward Petrucci if ERP would also assume [the Womco entities'] obligations and liabilities under their contracts with the Union," and that "Petrucci stated that [ERP] would not." Doc. #56-52, ¶¶ 10–11. Cwikla states that he "then told Edward Petrucci that the Union would not provide ERP with Union labor." *Id.*, ¶ 12.

Petrucci has submitted an affidavit in connection with this litigation denying that these conversations ever took place. *See* Doc. #62-4 at 2–3. However, Petrucci declined during his deposition to answer questions concerning the circumstances surrounding the creation of ERP. Indeed, Petrucci refused to answer every single question that was asked of him at the deposition, invoking his Fifth Amendment privilege against self-incrimination.

Other than the fact that ERP did not use union labor, Edward Petrucci's new company shares many similarities with the Womco entities. ERP works primarily on mechanical

---

common control." *See* 29 U.S.C. § 1301(b)(1): *Kombassan Holding*, 629 F.3d at 285 ("Under the principles of the common control doctrine, all businesses under common control are treated as a single employer for purposes of collecting withdrawal liability, and each is liable for the withdrawal liability of another.") (citations and internal quotation marks omitted).

insulation and asbestos removal projects, the same type of work performed by the Womco entities. It is true that ERP has done other types of jobs—snow removal, fire penetration, carpet removal, and demolition—but such work is, at best, an irregular occurrence. Indeed, it is undisputed that ERP has performed snow removal and fireproofing just twice for the same customer.

Although Edward Petrucci was briefly the president of ERP at the company's founding in February 2009, by March 2009 that title had been passed on to Joseph Vollano, a long-time employee of Petco Insulation Company. Matthew Petrucci, Edward Petrucci's son, became a director of ERP around the same time, and a few years later in 2012 he succeeded Vollano as president. Matthew Petrucci had previously worked for Incor Group. Inc. ("Incor"), a mechanical insulation and asbestos abatement company also owned by Edward Petrucci that did not use union labor.

Notwithstanding these changes in formal leadership, it is undisputed that Edward Petrucci's substantial responsibilities at ERP did not change when he stepped down as president in March 2009. He managed the accounting, finances, and accounts receivable at ERP, and he was by far the highest paid employee at ERP. From 2009 to 2012, ERP paid Edward Petrucci a total of $741,165.25, while Matthew Petrucci and Vollano were compensated just $218,690, and $347,062.82, respectively, during the same period. Edward Petrucci participates in hiring decisions. While there is conflicting testimony concerning whether Edward Petrucci solicits customers or manages job sites, the record indicates at least two specific instances when he obtained work for ERP based on his professional or personal relationships. Moreover, Edward Petrucci has signed both contracts and change-order documents on behalf of ERP.

Several of the key players at Womco—both managers and employees—had similar roles at ERP. Joseph Vollano, Kristen Petrucci, George Neblo, and Mark Noccioletti all either were managers or employees in the Womco entities and later had similar duties at ERP. Other ERP employees had previously worked for Incor, Edward Petrucci's other non-union company.

ERP operates at 88 Farwell Street in West Haven, in the same building that previously housed the Womco entities. For a period of time, ERP paid rent to the then-owner of the building, Petco Realty, a limited liability company of which Edward Petrucci is the resident agent and a member. But Petco Realty quickly defaulted on the mortgage, and the mortgage holder acquired the property and agreed to permit ERP to remain at the premises rent-free so long as the property was properly maintained. Eventually, a new owner bought the property. ERP pays rent to the new building owner and has since relocated to another area of the building.

ERP assumed possession of some items—ladders, asbestos equipment, extension cords, garden hoses, shovels, etc.—that were previously used by the Womco entities, although these items are used by ERP rarely, if ever, and they are worth very little. It is undisputed that every vehicle that ERP uses was formerly used by the Womco entities, although all these vehicles were returned to the dealership by the Womco entities before they were re-purchased or re-leased by ERP. Moreover, ERP used the same phone number as Petco Insulation Company. While ERP did not advertise this number, it is undisputed that if someone called the number for Petco, it would ring in ERP's offices.

ERP also served some of the same customers as the Womco entities. During the period from ERP's founding in 2009 until 2013, ERP had about 280 customers. Just 11 of these

customers were also customers of the Womco entities.[3] But these 11 customers accounted for a significant percentage of ERP's business volume. ERP's records indicate that the work performed for these 11 shared customers amounted to 30.4 percent of ERP's total business volume during this period.[4]

3. *The Platinum Litigation & Related Criminal Charges*

ERP has been involved with another lawsuit concerning its relationship with the Womco entities. In 2010, ERP was sued by an entity named Platinum Funding Services LLC ("Platinum"), who alleged that ERP was responsible as a successor entity for certain actions undertaken by Edward Petrucci and the Womco entities. *See* Doc. #56-36 (Platinum's complaint in *Platinum Funding Services LLC v. E.R.P. Group, Inc.*, NNH-CV-10-6013291-S (Conn. Super. Ct. 2010)). Platinum is a factoring company that purchases accounts receivables at a discount, providing a company with liquid assets at a discounted rate while purchasing the right to collect on the purchased receivables at a later date. Platinum alleged that it entered into a factoring agreement with the Womco entities, under which Womco would sell certain of its accounts receivables to Platinum. According to Platinum's complaint, the Womco entities had breached the agreement by instructing debtors to pay Womco, and not Platinum. Platinum further alleged that the Womco entities' invoices contained exaggerations, misrepresentations, and duplications, and that Womco sometimes engaged in "pre-billing"—that is, submitting

---

[3] Four of these eleven shared customers hired ERP for asbestos abatement or mold remediation projects outside the scope of the collective bargaining agreement—and not for mechanical insulation work that might be within the scope of the union. *See* Doc. #62-3, ¶6. The work done for the other seven customers was a mix of asbestos abatement/removal, mechanical insulation, firestopping, and other miscellaneous work. See Doc. #62-11 at 2.

[4] The following entities are former Womco customers who were also customers of ERP: Yale University and Yale University Properties; Curtain Walls & Windows Inc.; AAIS; Barry Associates; Finkle & Sons; Nutmeg Companies; Mega Mechanical; James V. Ursini Company; West Haven Housing Authority; Buckingham & Routh Co.; and Babbidge Facilities Construction. From 2009 to 2013, ERP sent invoices to these eleven customers totaling $2,337,978.44. *See generally* Doc. #62-12. ERP's total business volume during this period was $7,686,959.51. *Id.* at 33.

invoices to Platinum before the services were actually rendered and before the invoices were submitted to the account debtors.

Platinum alleged that ERP was liable for this wrongdoing because it was a successor to the Womco entities. According to Platinum's complaint, ERP is nothing more than a "mere continuation of the former business operations of [the Womco entities and Incor]" and had "succeeded to the ownership of the assets and liabilities of [the Womco entities and Incor]." Doc. #56-36, ¶¶ 45–46. In August 2012, the Platinum case settled. Under the terms of the settlement agreement, ERP agreed to pay Platinum $200,000.

The factoring agreement with Platinum also led to federal criminal charges against Edward Petrucci. In November 2013, Edward Petrucci pled guilty to wire fraud, in violation of 18 U.S.C. § 1343, and mail fraud, in violation of 18 U.S.C. § 1341. According to the stipulation of offense conduct appended to the plea agreement that Edward Petrucci signed, "Petrucci operated as the owner, either in both actual name and function, or, at a minimum, in function alone, of [the Womco entities and Incor]." *United States of America v. Petrucci*, Case No. 3:13-cr-00209-AVC, Doc. #3 at 10. The stipulation further stated that "Petrucci caused [the Womco entities and Incor] to sell invoices to Platinum which he knew to be fake and which were for work that Petrucci's companies had not performed and, in many cases, would not perform in the future. In total, the [Womco entities and Incor] received payments on fake or fraudulent invoices from Platinum of at least $1 million, but not more than $7 million." *Id.* at 11. Petrucci has been sentenced by Judge Covello to 57 months' incarceration. *See* 3:13-cr-00209-AVC; Doc. #49.

### 4. *This Litigation*

Plaintiff, the board of trustees of the union's pension fund, initiated this lawsuit against

the Womco entities and ERP seeking recovery of unpaid withdrawal liability pursuant to 29 U.S.C. § 1401(b)(1). *See* Doc. #1 (Pl.'s Compl.). ERP has appeared and has defended the action, but the Womco entities have not filed appearances.

Plaintiff has filed a motion for summary judgment. *See* Doc. #56. Plaintiff argues that there is there is no genuine issue of material fact that ERP is the alter ego of the Womco entities, and that ERP is therefore responsible for the Womco entities' withdrawal liability. In response, ERP readily concedes that the Womco entities ceased operations and stopped making contributions to the pension fund. And ERP acknowledges that the law imposes a duty on employers, like the Womco entities, to pay withdrawal liability to a pension fund upon going out of business. But ERP vigorously disputes that it is responsible for the Womco entities' unpaid withdrawal liability as an alter ego of those companies.

### DISCUSSION

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir.

2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

This case requires consideration of the alter ego doctrine in the context of a claim for unpaid withdrawal liability. From time to time, an employer who owes withdrawal liability pursuant to ERISA will attempt to evade this obligation by establishing a parallel or successor entity "through a sham transaction or technical change in operations." *Kombassan Holding*, 629 F.3d at 288 (quoting *Newspaper Guild of N.Y., Local No. 3 of the Newspaper Guild, AFL-CIO v. NLRB*, 261 F.3d 291, 298 (2d Cir. 2001)). This occurs when an employer that is a signatory to a collective bargaining agreement shifts its operations to a non-signatory entity for the purpose of avoiding withdrawal liability. The alter ego doctrine is designed to address this situation by "provid[ing] an analytical hook to bind [the] non-signatory [entity] to [the] collective bargaining agreement." *Ibid.* (citation and internal quotation marks omitted). "If two companies are deemed alter egos of each other, then each is bound by the collective bargaining agreements signed by the other," *Lihli Fashions Corp. v. NLRB*, 80 F.3d 743, 748 (2d Cir. 1996) (*per curiam*), and thus will be liable for each other's withdrawal liability.

How does the court determine whether one entity is an alter ego of another? The inquiry requires "weigh[ing] the circumstances of the individual case," paying particularly close attention to the following "important" factors: "whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Kombassan Holdings*, 629 F.3d at 288 (citation and internal quotation marks omitted). Additionally, an "anti-union animus or an intent to evade union obligations" may be a "germane" or "sufficient basis for imposing alter ego status," although it "is not a necessary

factor." *Ibid.* (emphasis omitted) (citation and internal quotation marks omitted). "No one factor is controlling, and all need not be present to support a finding of alter ego status." *C.E.K. Indus. Mech. Contractors, Inc. v. N.L.R.B.*, 921 F.2d 350, 354 (1st Cir. 1990).

Ultimately, "[t]he test of alter ego status is flexible," and must be applied in light of the "general federal policy of piercing the corporate veil when necessary" to protect employee benefits. *Kombassan Holdings*, 629 F.3d at 288 (citations and internal quotation marks omitted); *see also Leddy v. Standard Drywall, Inc.*, 875 F.2d 383, 387 (2d Cir. 1989) ("The Supreme Court has consistently refused to give effect to the corporate form where it is interposed to defeat legislative priorities."); *Lowen v. Tower Asset Mgmt., Inc.,* 829 F.2d 1209, 1220 (2d Cir. 1987) ("Courts have without difficulty disregarded form for substance where ERISA's effectiveness would otherwise be undermined.").

Although the issue is sometimes resolved after a bench trial, a district court may find that an entity is an "alter ego" for ERISA purposes on a motion for summary judgment. *See, e.g.*, *Castaldi v. River Ave. Contracting Corp.*, 2015 WL 3929691, at *3–5 (S.D.N.Y. 2015) ("[T]he Court has no difficulty in concluding that Plaintiffs are entitled to judgment as a matter of law that [the defendant companies] are alter egos" in view of "overwhelming and largely uncontroverted evidence."); *Bourgal v. Robco Contracting Enterprises, Ltd.*, 969 F. Supp. 854, 863 (E.D.N.Y. 1997) (deciding alter ego question on a motion for summary judgment where plaintiffs "produced sufficient evidence to establish that the corporate defendants constitute . . . alter egos, as a matter of law"), *aff'd*, 182 F.3d 898 (2d Cir. 1999).

Applying the relevant factors discussed above to the factual record here, I conclude that there is no genuine issue of material fact that ERP is the alter ego of the Womco entities for ERISA purposes. Because evidence concerning an intent to evade union obligations may be a

11

sufficient basis to establish alter ego status, I begin with a discussion of the evidence relevant to this factor. Here, there is direct evidence that ERP declined to employ union labor as a way to avoid the Womco entities' union obligations. As noted above, Kevin Cwikla, the union's business manager, states in an affidavit that Edward Petrucci called him in 2009 and asked that ERP be permitted to take over the Womco entities' subcontracts and use union labor. Cwikla states that he subsequently told Petrucci that, in order to use union labor, ERP would have to assume the Womco entities' "obligations and liabilities under their contracts with the Union." Doc. #56-52, ¶ 10. According to Cwikla, Petrucci responded by stating that ERP would not assume the Womco entities' union obligations, and the union then refused to provide ERP with union labor.

ERP does not (and could not) dispute that this conversation is material to the question whether ERP was created and operated with an intent to evade the Womco entities' union obligations. But it contends that the conversations that Cwikla recounts never actually happened, based upon an affidavit of Edward Petrucci that was submitted *after* he refused to answer every single question at his deposition.

Ordinarily, the existence of two affidavits presenting conflicting versions of events would preclude a grant of summary judgment to the extent that the disputed facts are material. *See, e.g.*, *Rojas v. Roman Catholic Dioceses of Rochester,* 660 F.3d 98, 104–05 (2d Cir. 2011) (noting that "a district court generally should not weigh evidence or assess the credibility of witnesses" when deciding a motion for summary judgment) (citation and internal quotation marks omitted). But an affidavit submitted on a motion for summary judgment can only create a genuine issue of material fact where there is "an implicit or explicit showing that the affiant is prepared to testify in a manner consistent with [the] affidavit." *Santos v. Murdock*, 243 F.3d

681, 684 (2d Cir. 2001). Where, as here, a witness invokes the Fifth Amendment in response to all questions at a deposition, a district court may decline to consider a later-filed affidavit by the witness because there is no indication at all that the witness would be prepared to testify at trial. *See, e.g.*, *Bourgal v. Robco Contracting Enterprises, Ltd.*, 182 F.3d 898, at *1 (2d Cir. 1999) (unpublished opinion) ("The district court was well within its discretion in precluding Defendants from submitting the affidavits, given the fact that Defendants had invoked the Fifth Amendment and/or spousal immunity with regard to virtually every question ever asked of them in deposition.") (citing *United States v. 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 85-86 (2d Cir. 1995)).

While the law permits a witness to invoke the Fifth Amendment in the context of the discovery process in a civil case, such an invocation has consequences. "[A] party who asserts the privilege against self-incrimination must bear the consequence of lack of evidence . . . and the claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation." *4003-4005 5th Ave.*, 55 F.3d at 83 (citations and internal quotation marks omitted). In view of this legal framework, I decline to consider Edward Petrucci's affidavit.[5]

I am left, then, with the uncontroverted affidavit of Kevin Cwikla. There can be no doubt that the conversations described in the affidavit, coupled with the other evidence in the record, establishes an intent to evade union obligations. To review: (1) ERP was started by Edward Petrucci around the same time that Petrucci's union companies—the Womco entities— went out of business and ceased making contributions to the union's pension fund; (2) Petrucci

---

[5] Edward Petrucci has never asked to withdraw the privilege or sought any other accommodation. *See 4003-4005 5th Ave.*, 55 F.3d at 83–85 (discussing procedures district court should follow when a party makes such a request).

called the union and asked that ERP be permitted to take over the Womco entities' subcontracts and utilize union labor; (3) the union demanded that, in order to use union labor, ERP assume the Womco entities' obligations and liabilities under their contracts with the union; (4) Petrucci (on behalf of ERP) declined to assume the Womco entities' obligations and liabilities; and (5) ERP ended up utilizing non-union employees. Based on these events, a rational fact finder could only conclude that ERP emerged and used non-union labor as a way to avoid the Womco entities' union responsibilities.

I also conclude that the other relevant factors—similarity of business purposes, management, operations, equipment, customers, supervision, and ownership—overwhelmingly support a finding that ERP is an alter ego of the Womco entities. To begin with, it is undeniable that the Womco entities and ERP have substantially identical business purposes: performing mechanical insulation and asbestos removal. ERP makes much of the fact that its business is not strictly limited to those areas in that it also performs snow removal, fire penetration, carpet removal, and demolition. But it is undisputed that such work is, at best, an irregular occurrence. ERP has performed snow removal and fireproofing just twice for the same customer. As Vollano and other witnesses testified, ERP's "major activities" are mechanical insulation and asbestos removal—the same major activities performed by the Womco entities. *See* Doc. #68-3 at 7 (Vollano Dep.). Any small distinction regarding irregular jobs that ERP may perform from time to time does not materially distinguish the otherwise identical business purposes of ERP and the Womco entities.

Moreover, there is no genuine dispute that the Womco entities and ERP operate with substantially identical management and ownership. In view of the record in this case and Edward Petrucci's stipulation of offense conduct in the criminal case against him, there can be

no doubt that Petrucci was at least functionally the owner of all of the Womco entities. Nor can there be any doubt that Petrucci was effectively the leader of ERP, notwithstanding the fact that others formally hold leadership positions.

Around the time that the Womco entities went out of business, Petrucci formed a new company and named it after his own initials: E.R.P.[6] Initially, Petrucci named himself as president of ERP. Shortly thereafter, his son, Matthew Petrucci, and Joseph Vollano, a longtime Petco employee, formally took over management at ERP. But it is undisputed that Edward Petrucci's responsibilities at ERP were the same during and after his brief tenure as president. Edward Petrucci still participated in hiring decisions, obtained work for ERP based on his professional or personal relationships, and signed contracts and change-order documents on behalf of ERP.

And, as noted above, Petrucci was the highest paid employee at ERP. During ERP's first three years in business, Edward Petrucci was paid more than twice as much as Vollano and more than three times as much as Matthew Petrucci. Additionally, despite the fact that he is formally the president of ERP, Matthew Petrucci in his deposition testimony demonstrated a lack of knowledge about the basic operations of the company. He could not (or chose not to) explain why he signed checks to his father totaling $40,000 in 2009. Nor was he aware that Edward Petrucci was paid a $40,000 bonus in 2010, and a $3,000 bonus in 2011. Cumulatively, these facts—Edward Petrucci founding the company, his unchanged responsibilities after he stepped down as president, his high salary, and Matthew Petrucci's lack of knowledge about his company—lead to the conclusion that Edward Petrucci is the prime actor on behalf of ERP.

---

[6] The precise chronology of the dismantling of the Womco entities and the creation of ERP is not entirely clear, but apparently Edward Petrucci formed ERP just before the Womco entities went out of business. The fact that the entities may both have operated at the same time for a few weeks or months does not preclude an alter ego finding. *See Kombassan Holding*, 629 F.3d at 288 (noting that "the alter ego doctrine" can be applied to both "successor companies" and "parallel companies").

Of course, the similarities between the Womco entities and ERP do not end with Edward Petrucci. Several others involved with the Womco entities— Joseph Vollano, Kristen Petrucci, George Neblo, and Mark Noccioletti—went on to work for or serve as managers or employees at ERP.

There are numerous operational and equipment similarities, as well. Most obviously, ERP has the same business location as the Womco entities: 88 Farwell Street in West Haven. Initially, ERP operated in the exact same office space that Petco previously used. At a later date, ERP moved to a different part of the building. ERP also uses the same phone number as Petco. Moreover, every vehicle used by ERP was formerly used by the Womco entities. ERP makes much of the fact that these vehicles were returned to the dealer, and then re-purchased or re-leased by ERP in an allegedly arm's length transaction. But that series of events—formally returning the vehicles to the dealership, and then immediately re-purchasing or re-leasing those vehicles—does not change the fact that ERP is using the exact same vehicles as the Womco entities.

Finally, the Womco entities and ERP share some customers. Plaintiff has identified only 11 shared customers out of over 280 total ERP customers. Yet these 11 customers comprise over 30 percent of ERP's total business volume from 2009 to 2013. While this overlap can hardly be described as conclusive, "given the quantum of evidence of overlap between [the Womco entities and ERP], the lack of substantial . . . overlap in customer lists is not dispositive." *See Plumbers, Pipefitters & Apprentices Local Union No. 112 Pension, Health & Educ. & Apprenticeship Plans ex rel. Fish v. Mauro's Plumbing, Heating & Fire Suppression, Inc.*, 84 F. Supp. 2d 344, 351 (N.D.N.Y. 2000) (finding companies were alter egos at summary judgment notwithstanding the fact that there was only a 20 percent overlap in customers); *see*

*also Bourgal*, 969 F. Supp. at 863 (finding companies were alter egos at summary judgment where companies shared "at least some of the same customers").

ERP's arguments against an alter ego finding are not persuasive. ERP suggests that it is a successor entity to Incor, Edward Petrucci's non-union company which shuttered around the same time the Womco entities went out of business. But ERP offers no explanation—in its brief or at oral argument—as to why this would be so. And even assuming that ERP were a successor to both Incor and the Womco entities, that fact would not prevent a finding that ERP is an alter ego of the Womco entities for ERISA purposes.

ERP also argues that it is inequitable to saddle it with withdrawal liability in view of the fact that Edward Petrucci is no longer involved with the company due to his criminal conviction. ERP cites no authority to support the theory that a corporate entity can escape its pension fund liabilities by a change of leadership or employees. Nor would such a theory be compatible with ERISA's policy of protecting employee benefits and applying a flexible alter ego test when necessary to effectuate that policy.

In view of the undisputed facts and the relevant legal framework, I have no difficulty concluding that ERP is an alter ego of the Womco entities as a matter of law. ERP is therefore liable to plaintiff for the Womco entities' unpaid withdrawal liability in the amount of $4,253,732. Because plaintiff is entitled to a judgment in its favor, it is also entitled by statute to liquidated damages in the amount of $850,746.40 and interest on the unpaid contributions in the amount of $92,164, as well as reasonable attorney's fees and costs.[7] *See* 29 U.S.C. § 1132(g)(2).

---

[7] ERP does not dispute plaintiff's calculation of the interest and liquidated damages owed by the Womco entities.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment (Doc. #56) is GRANTED. The Clerk of Court is directed to enter judgment forthwith in plaintiff's favor for joint and several liability against each of the company defendants in the total amount of $5,196,642.40—the total of withdrawal liability ($4,253,732), liquidated damages ($850,756.40), and interest ($92,164). Within 30 days, plaintiff shall file (1) an affidavit and other materials that will enable the court to calculate reasonable attorney's fees, and (2) a bill of costs.

The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 31st day of August 2015.


/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge